# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **MARC HOOK** | * | **CIVIL ACTION NO. 09-0423** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **ERIC H. HOLDER ET AL** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Petition for Writ of *Habeas Corpus* under 28 U.S.C. § 2241 filed by petitioner, Marc[1] Hook ("Petitioner") [Doc. #1]. The United States filed a response on behalf of the named respondents, urging dismissal of the petition [Doc. # 8], following which Petitioner filed a reply [Doc. #9]. An evidentiary hearing was held in this matter on June 17, 2009. For reasons stated below, it is recommended that the petition be **DISMISSED without prejudice**.

## BACKGROUND

Petitioner, claiming to be Marc David Hook, testified that he was born on March 13, 1970, in London, England, to parents Juliette and David Hook and that he has two brothers and a sister. At the hearing, he testified that he left London in 2002 to come to the United States by way of the Visa Waiver Program, which only allows an individual to remain in the country for ninety days; however, Petitioner overstayed the ninety-day period. On April 2, 2008, Petitioner was encountered by a Senior Border Patrol Agent who was conducting a transportation check at

---

[1] The court notes that, although Petitioner uses the spelling "Marc" in his petition, most, if not all of the documentation submitted herein uses the spelling "Mark." The court will use the spelling provided by Petitioner in his petition.

the Greyhound Bus Station in Baton Rouge, Louisiana. Doc. 8-3, Ex. 1. According to the Record of Deportable/Inadmissible Alien form submitted by the Government, at such time Petitioner, who was not in possession of his passport, stated that he was a British citizen and had entered the United States two weeks earlier under the Visa Waiver Program.[2] *Id*. However, according to the form, an investigation later revealed, and Petitioner subsequently admitted, that he last entered the United States in June 2004, at San Juan, Puerto Rico, aboard an American Airlines Flight arriving from Antigua; he stated that he did not depart the United States as required and had been residing in New York.[3] *Id*. Petitioner testified that he first came to the United States in 2002, subsequently left the country, and returned in September 2004.[4]

Petitioner stated that he was en route to Houston at the time he was arrested, and that he had in his possession two articles of luggage, a carry-on bag and a checked bag. He claimed that the items were seized by the border patrol and that he was never given an evidence receipt regarding the items. According to Petitioner, the carry-on luggage contained his cell phones, apartment keys, cameras, business files, and diaries. He stated that the checked bag had his clothes, shoes, and other valuables such as books. Petitioner testified that he also had $16,600 in

---

[2] "The [Visa Waiver Program] permits eligible nationals from certain designated countries to apply for admission to the United States for ninety days or less as non-immigrant visitors without first obtaining a visa." *McCarthy v. Mukasey*, 555 F.3d 459, 459-60 (5th Cir. 2009) (citing 8 U. S. C. § 1187)). "However, the statute imposes upon every participating alien a reciprocal waiver requirement . . . in that [p]articipating aliens must waive any right ... to contest, other than on the basis of an application for asylum, any action for removal ...." *Id*. (citing § 1187(b)(2)) (internal quotations omitted).

[3] He maintained that he supported himself by buying and then shipping cars to various African countries, mainly Senegal, Nigeria, and Ghana. *Id*.

[4] Petitioner appears to have suffered a heart attack in the days following his arrest, for which he was treated in Jackson, Mississippi, and he takes medication to treat his heart condition.

cash on him at the time he was arrested and he did not know where the money went.[5]

Susan Strother ("Strother"), Petitioner's deportation officer since November 2008,[6] testified that the form documenting the inventory of Petitioner's belongings revealed only one bag containing the following items: $450 cash, three cell phones with chargers, a set of keys, a watch, and various electronic devices.[7] Strother stated that it is standard procedure for detainees to be given an evidence receipt and therefore she assumed Petitioner was provided one.

On April 2, 2008, a Notice of Intent to Deport was issued by the United States Immigration and Customs Enforcement (USICE). Ex. 2. Since it was determined that Petitioner entered the United States pursuant to the Visa Waiver Program and had not departed within 90 days of such entry as required, he was ordered removed and a warrant for his removal was issued on April 2, 2008. *Id*. Subsequently, according to Petitioner, he met with immigration officers, specifically a Ms. Martin and Deportation Officer Jeannine Fruge, regarding attempts to obtain a travel document to allow him to return to the United Kingdom. He maintained that he fully cooperated with the officers and did everything that they asked him to do, including filling out the required documentation fully and truthfully.

Petitioner completed an application for a passport from the United Kingdom on April 17, 2008, along with a notification for a lost or stolen passport with the Passport Service of the United Kingdom. Ex. 5. On the passport application, Petitioner listed his father's name as

---

[5] He stated that the reason he had such a large amount of money with him was that he was going to buy a Ford F-150 truck in Houston.

[6] Strother testified that she had never spoken to or interviewed Petitioner; rather she has used other deportation officers as liaisons to interview detainees.

[7] It is somewhat unclear as the actual document was not entered into evidence, but the testimony indicated that the inventory was taken on June 26, 2008.

Hook, his mother's name as Juliet, and his brother's name as James Hook, but only "London" as their address. Petitioner testified that he did not have time to fill everything in because he was being rushed. He also completed a prisoner information sheet for the British Consulate General, which again listed his parents' names but gave no street address for such individuals. Ex. 7. Although Petitioner had previously indicated to the USICE that he left his passport in New York, according to his passport application to the United Kingdom, his passport was "lost upon arrest by Immigration - Baton Rouge, La." Ex. 5. Petitioner testified that the reason he made such statement was that he was told to do so by a USICE official to make it easier to obtain a travel document, even though he had maintained the he left his passport in New York.

According to Petitioner, because his cell phones were taken by the border patrol, he could not get the phone number of anyone in the United States who could help him obtain travel documents. He claimed that he attempted for three months after he was arrested to retrieve his luggage, but Fruge told him that she could not help him because the luggage was forfeited when it was not claimed within thirty days. He testified that he told Vice Consul Linda Kelly with the British Consulate that USICE was holding his apartment keys and his luggage; therefore, he could not get his passport, which he claimed was in NewYork. According to Petitioner, Vice Consul Kelly said she would talk to Fruge, following which Fruge told him that the only thing she could salvage from the luggage was his cell phone, camera, and apartment key, but that his diaries and business files were missing. Petitioner testified that his diaries contained addresses and phone numbers.

With regard to his parents' phone number or address in the United Kingdom, Petitioner stated that he did have them but there was no way he could get the cell phone numbers because they were locked in his cell phone. He claimed that Fruge brought him his cell phone at one

4

point but would only allow him to retrieve the number of his roommate, not any of his family members. However, when asked on cross-examination about his parents' addresses, he gave his mother's address and stated that one of his brother's lived in Hong Kong and the other in Manchester, and that his sister lived in Brussels. He stated that he gave this information to Vice Consul Kelly, but not USICE because they never asked.

Strother testified that USICE had not searched the phone numbers located on any of Petitioner's cell phones or attempted to call any of the numbers because the British Consulate was talking with Petitioner in an attempt to obtain information and because Petitioner has an obligation to assist in his removal. Petitioner testified that he has documents in the United States showing his identity but that he does not have access to them because they are in the possession of the detention facility in which he is housed or the border patrol. He stated that he has fully cooperated with USICE and the Consulate but that he cannot do anymore without access to his documents which were taken by the border patrol.

On April 18, 2008, the USICE requested the issuance of a travel document from the Consulate General of the United Kingdom of Great Britain. Ex. 8. On June 5, 2008, Petitioner was served with notification that he was to undergo a file custody review or Post Order Custody Review (POCR) on or about July 2, 2008. Ex. 10. He was also served with the first of a series of warnings by way of a Form I-229(a), Warning for Failure to Depart, and an instruction sheet regarding the requirements he was to meet to assist in his removal from the United States. Ex.11,12.

On June 13, 2008, Petitioner spoke on the phone with Vice Consul Kelly. Ex.13. According to a set of hand-written notes, Petitioner refused to answer Vice Consul Kelly's questions for "medical reasons,"stating that he had heart problems and was under observation by

a doctor. *Id*. The notes indicate that in response to a claim of racial profiling by Petitioner, Vice Consul Kelly explained to Petitioner that the Consulate was trying to verify his country because Petitioner could not be found in the British system under the passport number he provided at his entry. *Id*. Petitioner testified that he asked Vice Consul Kelly if she was racial profiling because when the call commenced, she immediately began asking him questions regarding who he was and where he was born; he stated that when she said that she was not racial profiling, he told her about his heart problems, in response to which she "dropped the phone" because, according to Petitioner, if she had known he was sick "she would have come to me like that." Petitioner stated that from that point on Fruge attacked him as if he was calling her [presumably Vice Consul Kelly] a racist.

On June 16, 2008, Petitioner refused to answer questions by Vice Consul Kelly via a record of sworn statement on the ground that he needed his lawyer present. Ex. 14. He testified that the reason he did not answer the questions was that Fruge and another man were going to be present during the questioning, and Vice Consul Kelly had previously told him that he should be alone with her if she was going to be asking personal questions. According to Petitioner, when he indicated that he did not want to talk with Fruge and the man in the room, Fruge read him his rights and told him that she was going to put him in jail for five to ten years if he made any errors, so he told her that he would not answer any questions without his lawyer. Strother testified that she was not present during any conversations between Petitioner and Vice Consul Kelly, but that typically the deportation officer is not asked to leave the room; rather, the consulate representative wants the deportation officer to hear the answers to the questions. On the same day, Petitioner was again served with a Form I-229(a) and an instruction sheet regarding the requirements of his assistance in effecting his removal. Ex. 15,16.

6

On June 17, 2008, Vice Consul Kelly requested that Petitioner provide, consistent with a telephone conversation between the two on the preceding day, various items of information which would evidence proof of his identity before his passport application would be granted. Ex. 17. These items could include his birth certificate from the United Kingdom, contact details for the family members Petitioner claimed to have in the United Kingdom, driver's licence, US Alien card, social security card, bank records, credit card statements, utility bills, tax statements, health records, educational records, and/or letters from professional individuals (doctor/employer/lawyer). *Id*. On June 17, 2008, the USICE transmitted to Vice Consul Kelly what purported to be a copy of Petitioner's driver's license from the United Kingdom that had been received the day prior. Ex. 18.

By letter dated June 20, 2008, Petitioner was advised by Vice Consul Kelly that the passport Petitioner claimed to have lost had previously been reported lost by an individual in the United Kingdom. Ex. 19. Petitioner was further advised that the person who had reported the passport lost had provided sufficient evidence of identification that matched previously issued passports and consequently, the lost passport had been replaced. *Id*. Petitioner was finally advised that the Consulate-General would need much more proof of his identity before the British passport facilities would be granted. *Id*. Petitioner testified he did not understand why this happened but that he is in fact the real Marc Hook, that the passport he entered the country with was real, and that he is not guilty of identity theft.[8]

---

[8] Strother testified that USICE had requested photos of the Marc David Hook whose passport was replaced, but the British Consulate would not provide them due to privacy concerns. She further stated that she did not believe that anyone with the British Consulate had attempted to contact the Marc David Hook whose passport has been reissued to interview him regarding any identity theft, and she stated that she never contacted the American Embassy in the United Kingdom to gain access to any photograph of Petitioner that might have been taken pursuant to his application to the Visa Waiver program; rather, she explained, USICE utilizes liaisons with the British Consulate to

7

On July 2, 2008, Petitioner was the subject of a post-order custody review. Ex. 21. The review team noted that the Vice Consul of the United Kingdom had advised the USICE that the passport had been lost or stolen and had been replaced by British authorities to the rightful owner and, therefore, Petitioner's identity could not be verified. The review also referenced the aforementioned June 13, 2008, and June 16, 2008, meetings between Petitioner and Vice Consul Kelly, in addition a face-to-face meeting on July 2, 2008, during which Petitioner again failed to provide any evidence of his citizenship.[9] *Id*. Finally, the review team noted that a request has been submitted to Interpol for assistance in identifying Petitioner.[10] *Id*. Strother testified that no action has been taken regarding any criminal prosecution of Petitioner as of yet. Since Petitioner's identity could not be established, and he was deemed a flight risk and a danger to the community, the review team recommended Petitioner's continued detention. On July 16, 2008, the Deputy Field Office Director agreed and ordered that Petitioner remain in the custody of the

---

determine if a Detainee is who he or she claims to be.

[9] According to review form, Petitioner stated that he could not provide any details of his life in the United Kingdom because the medications he was on caused memory loss; however, on July 2, 2008, Fruge ran a WebMD search and none of the medications Petitioner claimed to be on caused memory loss. *Id*.

[10] The request, which sought an investigation in the United Kingdom as well as several South African countries, noted that Vice Consul Kelly had informed the USICE that the true owner of the missing passport from the United Kingdom had been identified as Marc David Hook and a renewed passport had been issued to Mr. Hook. Ex. 22. It also sought the original passport application and photos of the subject the passport was issued to with his physical description and stated that the USICE was pursuing criminal prosecution in this case since fraud was suspected. *Id*. The request further noted that Petitioner claimed that he did not have the means to contact a "room-mate" who had his passport because the Border Patrol agents took all of his phones, where the number was stored, at the time of his arrest; however, the phone was provided to Petitioner and the number he called to reach the "room-mate" was not accepting calls. *Id*. Strother testified at the hearing that Interpol was unable to obtain any information regarding Petitioner's identity or citizenship, and USICE has not sent documents to any other nations in an attempt to obtain a travel document for Petitioner.

8

USICE. *Id*.

In the interim, by letter dated July 11, 2008, Vice Consul Kelly advised Petitioner that his passport application could only be kept open until the end of July 2008. Ex. 23. Petitioner was advised that unless he could provide the British Consulate with the paperwork discussed in earlier conversations with Vice Consul Kelly, Petitioner's application would have to be withdrawn due to his inability to convince the Consulate-General of his identity. *Id*.

On July 24, 2008, Petitioner was served with the July 22, 2008 written decision of the Field Office Director that he was to remain within custody of the USICE due to the inability of the United Kingdom to verify Petitioner's claim of citizenship necessary for the issuance of a travel document. Ex. 24. Petitioner was also advised that his status within the custody of the USICE would continue due to his flight risk and threat to the community. *Id*. Petitioner was once again served with a Form I-299(a) – Warning for Failure to Depart and an instruction sheet. Ex. 25, 26.

By letter dated August 15, 2008, Vice Consul Kelly advised the USICE that since Petitioner had not provided the British Consulate with any paperwork to support his identity or his nationality, his passport application had been withdrawn and the Consulate-General would be unable to provide Petitioner with any further consular assistance. Ex. 27. On September 9, 2008, Petitioner was served with the decision of the Field Office Director stating that the period of his removal from the United States was extended due to his failure to make timely and good faith efforts to obtain travel or other documents necessary for his removal. Ex. 28. Again, Petitioner was served with a Form I-299(a) – Warning for Failure to Depart and an instruction sheet. Ex. 29, 30. On September 10, 2008, Petitioner wrote to Deportation Officer Fruge and

9

complained of his continued detention within the custody of the USICE. Ex. 31.[11] Petitioner was served with separate Forms I-299(a) – Warning for Failure to Depart and instruction sheets on September 25, 2008, and October 23, 2008. Ex. 32, 33, 34, 35.

Meanwhile on March 18, 2009, Petitioner filed the instant habeas corpus petition challenging his post-removal detention under the framework established in *Zadvydas v. Davis*, 533 U.S. 678 (2001), claiming that the presumptively reasonable six-month detention period has expired and that there is no significant likelihood of his removal in the reasonably foreseeable future. He argues that he has no criminal convictions and has cooperated fully with all USBICE

---

[11] The letter stated as follows:

    I got your review letter dated 9-9-08 and the content has not changed from those things you continue to use against me to keep me here. For your candid information, I came into this country legally which you are fully aware of and I am pretty sure too that I am not the first person to be arrested without my passport in my possession. But you have taken it so personal that it seems there is something else to the whole issue. (Maybe the use of this statement "is this racial profiling" that you hate me for)[.] You took that statement out of contest [sic].

    First, I was arrested by the border patrol on April 2nd 2008 and my things were confirmed lost by them for more than 3-4 months and when I complained to you, you said there is nothing you can do until the [B]ritish counsole [sic] knew about it and when you finally get some of the things you kept them under lock and keys even those things that will help me. Secondly, for your information there is no landlord that will keep an apartment for 3 months plus without rent. So I lost everything in the apartment plus the things you [sic] asking from me.

    Nevertheless, I will be very glad if you can forget about your personal hatred of me and do your best to send me home. I know you better than this. Please send me home to get better medical checkups and I will hate to die in this custody.

    Conclusively, I sincerely hope God Almighty will help change the type of perspective you have against me.

    \* \* \* \*

requests to assist with his removal.[12] Petitioner further contends that the fact that the British Consulate has refused to issue him a passport due to difficulties in establishing his identity combined with the fact that more than ten months have passed since his final order of removal mandates that he be released. Subsequent to filing such motion, but prior to the evidentiary hearing, Petitioner provided to this Court what he claims is "substantial evidence of his identity, in the formats requested by the British consulate." This evidence consists of photocopies of the following: (1) his I-94 form; (2) what appears to be a check reorder form with the name Mark D. Hook and a Brooklyn, New York address on it; (3) a credit card with the name Mark D. Hook and a picture on it; (4) a letter from the credit card company to a Mark D. Hook regarding a returned item; (5) an American Airlines airplane ticket receipt dated May 31, 2007, containing the name Mark Hook; and (6) an AARP membership "issued" to a Mark Hook. Strother testified, however, these documents will not be helpful in obtaining a travel document for Petitioner because they convey nothing regarding Petitioner's being a British citizen. According to Strother, the reason Petitioner's removal period has been extended is that he has yet to provide any information sufficient to confirm his identity or citizenship.

## LAW AND ANALYSIS

In reviewing a petition for writ of habeas corpus by a detained alien who is subject to a final order of removal, a federal district court, pursuant to the authority of 28 U.S.C. § 2241(c)(3), is to gauge whether a particular set of circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal. "Following an order of removal, the Attorney General is given 90 days to effect the removal of the alien." *Ayigba v. Young*, 2007 WL

---

[12] He also states that he has no criminal record and significant family and business ties to the Brooklyn, New York community.

2736678, *4 (W.D.La. July 12, 2007) (citing INA § 241(a)(1)). The USICE is permitted to detain the alien during this removal period; when the 90 days expires, the alien is typically released. *Id*. (citations omitted).

In certain circumstances, however, the removal period, and accompanying detention, may be extended. Pursuant to U.S.C. § 1231(a)(6), an alien who is (1) inadmissible or (2) has been deemed a risk to the community or unlikely to comply with the order of removal may be detained beyond the 90-day removal period. *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). In *Zadvydas*, the Supreme Court held that 8 U.S.C. § 1231(a)(6), the post-removal-order detention statute, implicitly limits an immigrant's detention to a period reasonably necessary to bring about that immigrant's removal. *Id.* at 688-98. The Court noted, however, that the statute does not permit indefinite detention; the "reasonably necessary" detention period should be limited to six months after the removal order becomes final. *Id.* at 697-702. After that six month period expires, and the alien meets his or her initial burden of demonstrating that there is no significant likelihood of removal in the reasonably foreseeable future, the government must furnish sufficient rebuttal evidence. *Id.*

As the government correctly notes, the mere expiration of the six-month detention period does not, by itself, warrant release. Under *Zadvydas*,

> [t]he habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute. In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions. And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period.

*Zadvydas*, 533 U.S. at 699-700 (citations omitted). The Fifth Circuit has held that *Zadvydas* "creates no specific limits on detention"; rather, "'an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.'" *Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006) (citation omitted). In adopting a sliding temporal scale for determining when continued detention is reasonable, the Supreme Court has stated that "as the period of prior post-removal [order] confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink." *Zadvydas*, 533 U.S. at 701.

In addition, there are certain circumstances under which the removal period may be suspended or tolled, as is stated in 8 U.S.C. § 1231(A)(1)(C):

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

*See also Balogun v. I.N.S.*, 9 F.3d 347, 351 (5th Cir. 1993) ("[I]f it is shown that petitioner by his conduct has intentionally prevented the INS from effecting his deportation, the six-month period should be equitably tolled until petitioner begins to cooperate with the INS in effecting his deportation or his obstruction no longer prevents the INS from bringing that about."); *Ayiba*, 2007 WL 2736678 at *5-6 (finding that the removal period was tolled based on alien's failure to cooperate with efforts to deport him); *Benn v. Bureau of Immigration and Customs Enforcement*, 82 Fed.Appx. 139, 140 (5th Cir. 2003) (alien's incomplete and conflicting statements to the INS hampered removal efforts and therefore extended the removal period); *Dumpeh v. Moore*, 2007

WL 3235099, *1 (W.D.Tex. Oct. 26, 2007) (citations omitted) ("An alien must cooperate in good faith in his removal.").

Therefore, if the alien acts to thwart the USICE's efforts to removal him, the removal period is tolled during such time. Moreover, while section 1231(A)(1)(C) does not contain a time limitation regarding how long an alien who is acting to prevent his removal may be detained, the provision "does not present the same constitutional concerns raised by . . . [section] 241(a)(6) because 'the risk of indefinite detention that motivated the Supreme Court's statutory interpretation in *Zadvydas* does not exist when an alien is the cause of his own detention.'" *Rosario v. Gonzales*, 2007 WL 1232207, *5 (W.D.La. Apr. 25, 2007) (quoting *Pelich v. Immigration and Naturalization Service*, 329 F.3d 1057, 1060 (9th Cir. 2003)); *Ayigba*, 2007 WL 2736678 at *5. Therefore, "an alien cannot assert a viable constitutional challenge to his indefinite detention when such detention is due to his own actions." *Id*.

Although Petitioner has been detained for more than six months, the Government argues that *Zadvdas* is inapplicable at this time given Petitioner's actions in refusing to cooperate with USICE efforts to deport him by failing to provide any information that would confirm his identity or enable the USICE to obtain travel documents for him. The undersigned agrees. Initially, the undersigned notes that Petitioner overall was not a credible witness. Based on hearing Petitioner speak during the hearing, the undersigned finds that Petitioner's very strong accent is clearly not British.[13] Although the undersigned makes no finding as to whether Petitioner's name is in fact Marc David Hook, his accent alone makes it clear that he is not a lifelong resident of London,

---

[13] The undersigned also doubts that Petitioner is only thirty-eight years old as he claims. He looks much older than his claimed age, and has apparently been offered membership in AARP, a group which requires its members to be at least 50 years old.

England, as he claims. The British government has found that he is not the British citizen Marc David Hook who obtained the passport bearing the number Petitioner gave to the INS. It is equally clear that Petitioner has not fully cooperated with the USICE's attempts to remove him. Petitioner argues that more than a year has passed since he was ordered removed, and that the United Kingdom has withdrawn his passport request and stated that he will not be provided any further consular assistance. However, it was Petitioner's actions, or the lack thereof, that caused these things to occur.

The Government has submitted substantial evidence indicating that Petitioner is largely responsible for the delay in his removal. Although Petitioner initially completed various documents regarding efforts to remove him, the information he provided was clearly insufficient to aid in effecting his removal. For example, Petitioner has repeatedly listed only "London" as the address for his alleged immediate family, including his mother, father, and brother. However, at the hearing, Petitioner for the first time gave a purported address for his mother and stated that his brothers and sister live in Hong Kong, Manchester, and Brussels, respectively. Petitioner has provided no credible reason for not providing this information to USICE or the British Consulate before now, and such is indicative of the fact that he has failed to fully cooperate in efforts to remove him. Petitioner testified that he provided the addresses to Vice Consul Kelly, but the undersigned did not find this testimony to be credible, especially given Petitioner's failure to provide the addresses on his passport application and the numerous letters Vice Consul Kelly sent to Petitioner indicating that the Consulate was going to need much more information to verify Petitioner's identity and citizenship, in one of which Vice Consul Kelly specifically requested contact information for Petitioner's family in the United Kingdom.

In addition, the documentation submitted by the USICE indicates that Petitioner

repeatedly refused to answer questions intended to aid in his removal. According to a handwritten notation dated June 13, 2008, Petitioner refused to answer Vice Consul Kelly's questions during at telephonic interview for medical reasons,[14] and the Record of Sworn Administrative Proceeding dated June 16, 2008, reveals that Petitioner refused to answer questions on the grounds that he needed a lawyer present. *See Hango v. Gonzales*, 2006 U.S. Dist. LEXIS 96340, *20 (W.D.La. Sept. 15, 2006) (noting that "cases finding that a petitioner has failed to cooperate generally involve a failure to provide needed information or the providing of inconsistent information such that a petitioner's identity cannot be verified by the foreign government from whom travel documents are sought"). Petitioner testified that the reason he refused to answer Vice Consul Kelly's questions was that she had advised him that he should be alone when talking to her; however, the undersigned did not find this testimony to be credible. Strother testified that it is customary for deportation officers to be present in such a situation, and the circumstances were simply not such that confidentiality was an issue, especially given that the USICE, on whose part the deportation officer is acting in coordination with the Consulate, is responsible for effecting Petitioner's removal, and is entitled to the information.

The undersigned also did not find Petitioner's claim regarding USICE's denying him access to his luggage, which he unconvincingly claims contains documentation relevant to establishing his identity and citizenship, to be credible. Petitioner claims to have had two articles of luggage with him when he was arrested by the border patrol, a suitcase that he checked and a carry-on bag, the latter of which he contends had in it business files and diaries that contained

---

[14] It is unclear from Petitioner's testimony whether his claim is that Vice Consul Kelly ended the phone call when she found about Petitioner's medical problems; however, to the extent that such is Petitioner's contention, the undersigned does not find it to be a credible one.

16

information that could be useful in establishing his identity, in addition to $16,600 in cash. However, USICE's record of the inventory taken of Petitioner's belongings do not reveal any business files or diaries or any other information regarding Petitioner's identity or citizenship.[15] Moreover, with regard to the documentation presented by Petitioner following the filing of the instant petition, Vice Consul Kelly requested this type of documentation in June of 2008 in an effort to establish Petitioner's identity, and Petitioner has failed to provide any believable reason for not giving it the USICE or the British consulate at an earlier time. In addition, none of the documentation in any way demonstrates that Petitioner is a citizen of the United Kingdom.[16]

Hence, based on the evidence in the record, the undersigned finds that Petitioner has hampered USICE's efforts to remove him. He has failed to provide USICE with sufficient information regarding his identity and citizenship or that would enable USICE to obtain travel documents for him. Petitioner's failure to cooperate with USICE officials has suspended the removal period, and the USICE will be justified in continuing such suspension until Petitioner begins to cooperate with efforts to remove him.

In addition, even if this case is considered solely under *Zadvydas* irrespective of any statutory tolling of the removal period, Petitioner has failed to demonstrate that there is no likelihood of his removal in the reasonably foreseeable future. "Petitioner's cooperation with the removal process is relevant to the inquiry of whether there is a significant likelihood of removal in the reasonably foreseeable future." *Ayigba*, 2007 WL 2736678 at *6 (citations omitted). In

---

[15] Moreover, Strother had never heard anything regarding the alleged $16,600 in cash until the Petitioner testified at the hearing.

[16] The undersigned notes that the purported AARP membership card appears to be a solicitation to join the AARP, not an actual membership card, and also notes that AARP solicitations are generally sent to people whose records show that they have reached the age of fifty.

the case *sub judice*, there is no indication that the United Kingdom, or whatever country Petitioner hails from, will not repatriate him if and when he provides adequate evidence of his identity and/or citizenship. While the British consulate has withdrawn Petitioner's passport request and stated that he would not be provided any further assistance, there is no reason to believe that the British Consulate, or that of whatever country Petitioner may in actuality hale from, would be unwilling to further assist in Petitioner's removal once he gives his full cooperation.

## CONCLUSION

For the reasons discussed above, the undersigned finds that Petitioner has hampered the USICE's efforts to effect his removal and that such has tolled the removal period. The undersigned further finds that there is no indication at this time that Petitioner will not be removed to his country of origin if he cooperates in the efforts to establish his identity and citizenship.[17]

Thus, **IT IS RECOMMENDED** that Hook's Petition for Writ of *Habeas Corpus* under 28 U.S.C. § 2241 [Doc. #1] be **DISMISSED without prejudice.**

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or

---

[17] Petitioner, who did not name the warden of the facility at which he is being detained as a defendant in this action, spends a great deal of time arguing that the various defendants he has named, including the attorney general, are proper respondents in response to the Government's argument that the warden is the only proper respondent. However, given the above finding that Petitioner is not entitled to release, the undersigned need not address this issue at this time.

response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 19th day of June, 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE